IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

LISA WINKELMAN,                          )
                                          )        CASE NO. 3:15-CV-1751
                    Plaintiff,            )
        v.                                )
                                          )        JUDGE JAMES G. CARR
                                          )
                                          )        MAGISTRATE JUDGE
COMMISSIONER OF SOCIAL                     )        KENNETH S. McHARGH
SECURITY ADMINISTRATION,                   )
                                          )        REPORT & RECOMMENDATION
                    Defendant.            )

This case is before the Magistrate Judge pursuant to Local Rule 72.2(b).  The issue before

the undersigned is whether the final decision of the Commissioner of Social Security

("Commissioner") denying Plaintiff Lisa Winkelman's ("Plaintiff" or "Winkelman")

applications for Supplemental Security Income ("SSI") benefits under Title XVI of the Social

Security Act, 42 U.S.C. § 1381 *et seq*., and for a Period of Disability and Disability Insurance

benefits under Title II of the Social Security Act, 42 U.S.C. 416(i) and 423, is supported by

substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Magistrate Judge recommends that the decision of the

Commissioner be AFFIRMED.

## I.  PROCEDURAL HISTORY

Plaintiff filed simultaneous applications for Supplemental Security Income and Disability

Insurance benefits on December 20, 2012, alleging disability due to conditions involving her

back and hips, with an alleged onset date of December 31, 2011.  (Tr. 86). The Social Security

1

Administration denied Plaintiff's application on initial review and upon reconsideration.  (Tr. 86-97, 99-112).

Plaintiff requested that an administrative law judge ("ALJ") convene a hearing to evaluate her application.  (Tr. 124-29).  On April 7, 2015, an administrative hearing was convened before Administrative Law Judge Hope G. Grunberg ("ALJ").  (Tr. 31-85). Plaintiff appeared, represented by attorney Daniel L. Webb, and testified before the ALJ.  (*Id.*).  A vocational expert ("VE"), James M. Fuller, also appeared and testified.  (*Id.*).  On April 27, 2015, the ALJ issued a decision finding Plaintiff was not disabled.  (Tr. 11-25).  After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy.  (*Id.*).  Subsequently, Plaintiff requested

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)    If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)    If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)    If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)    If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)    Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

review of the ALJ's decision from the Appeals Council.  (Tr. 7).  The Appeals Council denied

her request for review, making the ALJ's April 27, 2015, determination the final decision of the

Commissioner. (Tr. 1-3).  Plaintiff now seeks judicial review of the ALJ's final decision

pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II.  EVIDENCE

### A.   Personal Background Information

Plaintiff was born on June 3, 1964, and was 47 years old on the alleged onset date, and 50

years old on the hearing date.  (Tr. 37, 86, 99).  Plaintiff completed the 10th grade,   and is able

to read, write, and communicate in English.  (Tr. 35).  Plaintiff has past work as a general laborer

and upholstery/industrial sewing  (Tr. 46, 96).  Plaintiff lives with her sister, who is disabled, and

does not have a driver's license, as it was revoked following a DUI prior to her onset date.  (Tr.

41, 43).

### B. Medical Evidence[2]

#### 1.  Treating Source Evidence

On July 18, 2013, and again on August 14, 2013, Nagaveni Ragothaman, M.D., a

psychiatrist with the Zepf Center, diagnosed Plaintiff with Depressive disorder NOS, opioid

dependence, alcohol dependence in remission, and cocaine abuse in remission  (Tr. 407, 557-58).

Plaintiff stated she lives with her sister, watches TV and reads books, worked part-time as an

upholsterer 3-10 hours per week, and was trying for other jobs.  (Tr. 557).  She reported sleep

disturbance, anxiety, moderate to severe depression, and crying spells, although she denied

suicidal ideation.  (*Id.*).  She further stated she had taken Percocet that morning, and buys

---

[2] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to
Plaintiff's appeal.  It is not intended to reflect all of the medical evidence of record.  As Plaintiff's
assignments of error refer to her mental abilities, the medical evidence summary focuses on her mental
health records.

Percocet and Suboxone from the street, but that she had not used cocaine since her early 40s, and had not drank alcohol since 2003.  (*Id.*).  Dr. Ragothaman noted a slight tremor in her hands, continued her on Zoloft, and recommended an alcohol and drug abuse treatment program.  (*Id.*).

Treatment notes dating from August 30, 2013 to March 13, 2015, show Plaintiff continually complained of sleep problems, anxiety, and depression, although her report as to the severity of these conditions fluctuated between non-existent, minimal (not being depressed every day), moderate and severe.  (Tr. 532-36, 545, 548, 550, 555-56, 559).  Plaintiff was continually prescribed anti-depressant/anti-anxiety medication (including Zoloft and Celexa), but often chose not to take them as directed.  (Tr. 492-93, 513, 532, 545, 555, 556).  Records indicated that her symptoms at least sometimes decreased when taking Zoloft (Tr. 556).  Plaintiff repeatedly reported continued use of opiates, specifically Suboxone and Percocet at appointments between April 30, 2013 and May 12, 2014, oftentimes obtaining the drugs "off the street."  (Tr. 533-34, 545, 550, 555-56).  Although offered by her doctor, Plaintiff continually refused psychotropic medication.  (Tr. 548, 550).

At this time, Dr. Ragothaman also completed a Mental Status Questionnaire for the state agency.  (Tr. 407).  The Questionnaire reflected findings in his treatment notes, showing Plaintiff was appropriately dressed, made good eye contact, had normal speech, but appeared to have a depressed mood and anxiety, although she was oriented to time, place and person. (Tr. 407, 557).  Dr. Ragothaman rated Plaintiff's cognitive functioning as "average," found her oriented in time, place, and manner, and noted average intelligence with no hearing of voices or paranoia.  (*Id.*)  He additionally opined that Plaintiff was incapable of managing any benefits awarded.  (*Id.*).  The entirety of his Medical Source Statement (MSS) regarding her work-related abilities, including understanding and following directions, and concentrating and completing tasks, was

noting that Plaintiff performed upholstery 2-10 hours per week, and denied any related limitations.  (Tr. 408).

On August 30, 2013, Plaintiff had a follow-up appointment at the Zepf Center with Barbara Thomas, RN, to whom Plaintiff reported she was anxious, "easily distracted" and tired a lot, but "doing what [she has] to do."  (*Id.*).  On September 27, 2013, Plaintiff again arrived unaccompanied to see Dr. Ragothaman, and noted similar findings to those from his July 18, 2013 evaluation. Dr. Ragothaman noted that Plaintiff has transportation difficulties, and recommended transportation resources, as well as individual therapy.  (*Id.).*  On December 20, 2013, she reported mild mood complaints, and Dr. Ragothaman noted Plaintiff continued her part-time job doing upholstery, while looking for full time employment.  (*Id.*). Dr. Ragothaman quoted Plaintiff as saying: "I'm good at my work, and I have been doing this work for the past 18 years." (*Id.*).  Further, Plaintiff noticed GI upset symptoms when she was in opiate withdrawal, which she reported at subsequent visits.  (Tr. 408, 548).

At another visit with Dr. Ragothaman on February 24, 2014, Plaintiff stated she had not worked since December, and was frustrated over not having any income.  (Tr. 548).   Plaintiff had a sad and anxious affect, was crying, but had no abnormal body movements other than squirming, and exhibited average insight and judgment, with a goal-oriented thought process. (*Id.*).  Plaintiff again reported she took four Percocet tablets per week, the last dose taken that morning, but denied alcohol use.  (*Id.*).

Following an April 10, 2014 discharge after a 5-day period at Rescue Crisis, Plaintiff again presented to Dr. Ragothaman on April 14, 2014.  (Tr. 545).  Plaintiff stated she was abusing opiates and suffering from withdrawal symptoms (having last used Percocet 5 days prior), got Klonopin and Suboxone from her sister, and was treated at University of Toledo

Medical Center for suicidal ideations.  (*Id.*).  Plaintiff complained of nausea and abdominal cramping, and exhibited minimal tremor in her hands.  (*Id.*).  Dr. Ragothaman noted her affect as anxious and tense, but that she had average insight and judgment, was alert and oriented, and had a goal-oriented thought process.  (*Id.*).

On May 12, 2014, a mental status examination revealed generally normal findings on observation.  (Tr. 532).  Dr. Ragothaman noted an anxious and irritable mood with constricted affect, but clear speech, logical thought process, partial insight, with normal judgement and thought content, findings which were repeated at an October 3, 2014 exam.  (Tr. 513-14, 532-36).  He also reported Plaintiff was squirming and shaking her legs during the exam, and recommended treatment for substance abuse and mental illness, noting a GAF score of 52, down from a previous GAF score of 53 on July 9, 2013.  (Tr. 533-34).  Records from the October 3 exam indicated Plaintiff last used opiates from the street in May of 2014, but that she currently uses drugs, with diagnoses of depression and opioid dependence, noting she is on Suboxone. (Tr. 514).  At that time Dr. Ragothaman directed Plaintiff to continue taking Celexa, Suboxone, and Vistaril and Remeron for sleep, and gave a current GAF of 55 (as of September 29, 2014), noting a highest GAF of 60, dated August 13, 2014.  (Tr. 515-17).

After walking to the Zepf Center for an examination for pharmacological management on October 17, 2014, Plaintiff reported to Barbara Thomas that she was sleeping a lot but had poor appetite, and that she had again not been taking her medications, but would start again. (Tr. 507). Plaintiff complained of being depressed, stated she spends her days coloring, watching TV, and caring for her cats, and that she does not like to be around people because they irritate her.  (*Id.*). Examination revealed generally normal findings and no significant changes, except mood and affect indicated a "notable change" in that Plaintiff was "still depressed."  (*Id.*).  Further, Ms.

Thomas reported that Plaintiff exhibited a euthymic mood, constricted affect, clear speech, "circumstantial loose" thought process, average intelligence, partial insight, an erratic and inconsistent short-term memory, and a mildly impaired ability to make reasonable decisions. (Tr. 507-08).  The report also included therapy goals, objectives, and interventions from sobriety treatment sessions dated from July 15, 2014 through September 29, 2014, and documented a highest GAF of 60. (Tr.  509-12).

Cathi Smith, RN, a psych nurse, examined Plaintiff at the Zepf Center on November 6, 2014. (Tr. 504).  Notes indicate Dr. Ragothaman spoke with Plaintiff at some point during the office visit.  (*Id.*).  Plaintiff reported non-compliance with her medication regimen to Ms. Smith, specifically that she took Remeron for only 2 weeks because it was too sedating, and notes showed that there were no significant changes to her condition.  (Tr. 499-500).  Examination revealed avoidant eye contact, accelerated activity, an angry, anxious, and irritable mood, constricted affect, rapid and pressured speech, racing thought process, and paranoid thought content.  (Tr. 500).  Further, Plaintiff reported auditory hallucinations ("voices in her head."). (*Id.*).  Adjustments were made to Plaintiff's sleep medication, and opioid dependence with a GAF of 60 was assessed.  (Tr. 504).

On February 9, 2015, Plaintiff was examined by Kathleen Baldoni, R.N., at the Zepf Center.  (Tr. 494).  Dr. Ragothaman also stepped in to talk to Plaintiff during the examination. (*Id.*).  Records documented that Plaintiff had a social security hearing coming up, but had "just now presented with a request for evaluation."  (Tr. 492).  Further, notes stated Plaintiff was "pleased that she is still clean," although was not adherent with antidepressant treatment.  (*Id.*). At that time Plaintiff was cooperative but depressed and anxious, exhibited a flat affect, rapid and pressured speech, and a tangential thought process, was preoccupied but denied

hallucinations, and showed normal judgment.  (Tr. 493).  Ms. Baldoni summarized Plaintiff as tearful, confused, and disjointed at times, and a GAF of 60 was documented.  (Tr. 493, 495).

In February of 2015, Plaintiff was examined at Navarre Park Family Health Center.  (Tr. 636-41).  Notes show Plaintiff stated she was feeling well with no complaints, sleeping well, but had decreased energy due to weather and her age.  (Tr. 636).  Plaintiff was noted as in remission from opioid abuse, and reported taking Suboxone and being clean for six months.  (Tr. 636-40).  The examiner noted Plaintiff reported chest pain associated with panic attacks, but that she was compliant with her medication regimen, which she considered effective.  (Tr. 639).

On March 13, 2015, Dr. Ragothaman assessed Plaintiff with severe major depressive disorder, recurrent episode, specified as with psychotic behavior, noting medications were beneficial. (Tr. 559, 563).  Plaintiff informed Dr. Ragothaman she experienced suicidal thoughts off and on, but had no serious suicidal plan, and denied suicidal thoughts at that time.  (Tr. 559).  Plaintiff denied paranoid thoughts, but notes indicated she had been hearing male voices in her head for two years, and reported hypomanic symptoms.  (*Id.*).  Dr. Ragothaman observed intermittent eye contact, accelerated activity, a depressed, anxious, and irritable mood, rapid speech, a constricted affect, and logical thought process with depressive and anxious content.  (Tr. 559-60).  He further noted minimal tremor in Plaintiff's hands, and documented Plaintiff last used opiates ten months prior, but had two relapses, so actual last use was seven months prior.  (Tr. 560).  Treatment notes indicated Plaintiff needed treatment for mental illness and substance abuse, but that she takes her prescribed medication, and Dr. Ragothaman assigned a GAF of 45 (noting a highest GAF of 60, dated August 13, 2014).  (Tr. 561).  Dr. Ragothaman directed Plaintiff to continue her medication, and to try the antipsychotic Abilify.  (Tr. 563).

At this time Dr. Ragothaman filled out a Mental Impression Questionnaire which indicated a primary diagnosis of major depression, recurrent, severe with psychotic features, and a "fair" prognosis. (Tr. 568).  Without specifically identifying details or associated signs and symptoms, Dr. Ragothaman wrote on the questionnaire to "refer to notes."  (Tr. 568-69). Further, in explanation of his check-box opinion, as described below, Dr. Ragothaman pointed to both Plaintiff's "severe depression" and that she is "also on medication for opiate dependency," as well as a low frustration tolerance, difficulty in concentration and distractibility, and that "she can't tolerate full time job stress" and has "tried several jobs."  (Tr. 570).

Dr. Ragothaman provided a checkbox opinion regarding Plaintiff's work-related abilities. Dr. Ragothaman opined that Plaintiff was "unlimited or very good" at asking simple questions or requesting assistance, avoiding hazards, interacting with the public, maintaining socially appropriate behavior, and hygiene.  (Tr.  570-71). He also determined Plaintiff had "limited but satisfactory" abilities to:  remember work-like procedures; understand, remember, and carry out very short and simple instructions; and sustain an ordinary routine without special supervision. (*Id.*).  However, Dr. Ragothaman found Plaintiff was  "seriously limited"[3] in her ability to work in coordination with others without being unduly distracted, complete a work-day/work-week without interruptions from psychologically based symptoms, deal with normal work stress, respond appropriately to changes in a routine work setting, perform at a consistent pace without a unreasonable number of rest periods, understand, remember and carry out detailed instructions, set realistic goals or make plans independently of others, accept instructions and criticism from supervisors, and get along with co-workers.  (*Id.*).   The opinion further stated Plaintiff was

---

[3] The questionnaire defined "seriously limited" as meaning "your patient has noticeable difficulty (e.g., distracted from job activity) from 11 to 20 percent of the work-day or work-week."

"unable to meet competitive standards"[4] in her ability to maintain attention for two hour segments, maintain regular attendance and be punctual within customary, usually strict tolerances, make simple work-related decisions, travel to unfamiliar places, and use public transportation. (Tr. 570-71).

The Questionnaire further required Dr. Ragothaman to opine as to Plaintiff's functional limitations resulting from Plaintiff's mental impairments.  (Tr. 571-72).  Next to the heading "Functional Limitations," Dr. Ragothaman hand-wrote "marked," with no further explanation. (Tr. 571).  He went on to provide a check-marked opinion that Plaintiff had marked limitations in her activities of daily living, marked difficulties in maintaining concentration, persistence, and pace, but only moderate difficulties in social functioning.  (Tr. 573).  However, Dr. Ragothaman noted that Plaintiff was in treatment for opiate dependency, which has resulted in her being "clean from opiates from [the] street for 7 months," and opined that her substance abuse contributes to her limitations.  (Id.).  Dr. Ragothaman then stated he would change Plaintiff's "marked limitation" findings if Plaitniff was "totally abstinent from alcohol or substance abuse." (Id.).

Dr. Ragothaman checked a box indicating Plaintiff had "one to two" episodes of decompensation within 12 months, each at least two weeks long, and notably did not check the box indicating three such episodes in the "Functional Limitations" check-box chart.  (Tr. 572). However, in another part of the opinion, Dr. Ragothaman checked a box indicating that Plaintiff had three or more such episodes of decompensation. (Id.).  He further opined Plaintiff's mental impairments would cause her to be absent from work more than four days per month.  (Id.).

---

[4] The questionnaire defined "unable to meet competitive standards" as meaning "your patient has noticeable difficulty (e.g. distracted from job activity) from 21 to 40 percent of the work-day or work-week."

On November 18, 2013, and November 22, 2013, Plaintiff did not appear for her appointments with Dr. Ragothaman. (Tr. 551-52). Plaintiff additionally was reported as not showing up for scheduled appointments at the Zepf Center on April 7, 2014, April 21, 2014, and June 23, 2014. (Tr. 530, 541, 546).

2. <u>State Agency Examining Consultant – Dr. Robie</u>

Before seeing Dr. Ragothaman, Plaintiff was referred to state agency consulting psychologist Dr. Karen Robie, Ph.D., for a mental examination performed on May 14, 2013. (Tr. 347). Plaintiff traveled to the examination by bus, and initiated, but did not complete, office paperwork. (*Id.*). The examination report referenced a previous DDD exam performed by Dr. Shah, a physician, dated March 25, 2013, that noted Plaintiff sough disability due to back pain; following examination, Dr. Robie opined that Plaintiff's presentation was not consistent with Dr. Shah's report of no significant mental impairment. (Tr. 347, 351). At this time, Plaintiff stated she applied for disability benefits because "it has been rough for her for the past five years," and said she cannot work because her boss "got me on a tight leash." (*Id.*). Dr. Robie noted difficulty following Plaintiff's story, stating Plaintiff exhibited pressured speech, spoke in phrases rather than sentences, expressed ideas in a rambling and disconnected manner, and often provided vague responses; however, intelligibility was clear. (Tr. 350). Dr. Robie determined Plaintiff "may not be able to manage benefit funds in her best interest if they are granted to her. She seemed to have difficulty thinking today." (Tr. 351).

Dr. Robie found Plaintiff to be compliant and cooperative during the one hour evaluation, but found it challenging to communicate with her, noting her responses were often "off-target," and that she persistently required redirection to provide a proper response. (Tr. 347). Plaintiff reported a history of hallucinations and anxiety with panic attacks, as well as depression,

impulsivity, both racing and slow thoughts, and problems with concentration.  (Tr. 350). Plaintiff denied having any drug or alcohol on the day of the evaluation, and claimed to have last used illicit opioids ten years prior, and stated "[o]ld man would give me some percs … I don't know – maybe six months ago when I got that job or something." (Tr. 349). Dr. Robie concluded that, due to Plaintiff's denial of present drug use, "there is no clear explanation for her pressured speech, difficulty focusing, inattention, and lack of targeted responses."  (Tr. 351).

Following her functional assessment, Dr. Robie formulated opinions regarding Plaintiff's work-related abilities.  (Tr. 351).  As to her abilities to understand, remember, and carry out instructions, Dr. Robie determined Plaintiff had a limited ability to understand and follow instructions due to a lack of attention.  However, when prompted or re-directed, she was able to respond to specific questions and attempt tasks.  (*Id.*).  As to her ability to maintain attention, concentration, persistence and pace to perform simple and multi-step tasks, Dr. Robie found Plaintiff remained attentive during the one-hour evaluation, but again noted she did not listen well, which compromised communication.  (*Id.*).  Although Dr. Robie found Plaintiff to have difficulty completing tasks that required concentration, she further noted that Plaintiff persisted with most tasks to their completion.  (*Id.*).  Regarding Plaintiff's abilities to respond appropriately to supervisors and co-workers, Dr. Robie recognized Plaintiff's conflictual relationships with her family and her current boss (whom Plaintiff described as abusive), as well as compromised communication due to her failure to listen well, but found that she demonstrated moderate social skills. (*Id.*).  Finally, Dr. Robie found, with regard to her ability to adaptively respond to work pressures, Plaintiff had weak adaptive coping skills and stronger survival skills, a limited ability to understand problems in life and to identify and apply appropriate problem-solving strategies, limited insight, and variable judgment.  (*Id.*).

Dr. Robie diagnosed Plaintiff with cognitive disorder NOS, and alcohol dependence in full sustained remission (per patient report).  (Tr. 349, 351-52).  She assigned Plaintiff a GAF of 50, indicating serious functional difficulty or serious symptoms.  (Tr. 352).  Dr. Robie stated her diagnosis and conclusions were based on records provided to the examiner, Plaintiff's self-reporting (although she had noted earlier Plaintiff was a poor informant), and observations made during the evaluation.  (Tr. 351-52).  It was further noted that no formal drug testing or screening was conducted.  (Tr. 352).

### 3.  State Agency Reviewing Consultants

On June 14, 2013, Vicki Warren, Ph.D., reviewed the medical evidence on file and completed a "Mental Residual Functional Capacity Assessment." (Tr. 93-95). Dr. Warren opined that, while Plaintiff has understanding and memory limitations, she was not significantly limited in her ability to remember locations and work-like procedures, or to understand, remember, and carry out very short and simple instructions.  (Tr. 93-94).  However, she found Plaintiff was moderately limited in her ability to understand and remember detailed instructions, supported by Plaintiff's exhibition of a limited ability to follow instructions during her clinical evaluation. (Tr. 94).  Regarding Plaintiff's sustained concentration and persistence limitations, Dr. Warren opined Plaintiff was not significantly limited in her ability to carry out very short and simple instructions, to perform activities within a schedule, maintain regular attendance and be punctual, or to make simple work-related decisions, but was moderately limited in her ability to: carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others, or to complete a normal workday or work week without interruption from psychologically based symptoms, and to perform at a consistent pace without an unreasonable amount of rest periods.

13

(Tr. 94).  Further, Dr. Warren found Plaintiff had moderate limitations in her ability to interact appropriately with the general public, and to accept instructions and respond appropriately to supervisors, but no other significant limitations relating to work-related social interactions, based on self-reports of challenging interpersonal relationships and difficulty being around others.  (Tr. 94-95).  Finally, Dr. Warren concluded Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, due to anxiety symptoms, but found no other work-related adaptation limitations.  (Tr. 95).

Dr. Warren concluded that Plaintiff is able to perform simple, one to two step tasks in a static environment.  (Tr. 95).  She further opined Plaintiff should have only occasional contact with the public.  (*Id.*).  State reviewing psychologist Irma Johnston, PsyD, confirmed Dr. Warren's opinions at the reconsideration level. (Tr. 107-11).

### 4.  Other Records

On July 24, 2013, Jessica Broz conducted an Adult Diagnostic Assessment at Central Access Rescue Mental Health Services with a presenting problem of substance abuse concerns.  (Tr. 396-406).  Plaintiff reported she had been using opiates for the past ten years, taking approximately four pills of Percocet and one half strip of Suboxone per day, detoxing once per month, and stated her substance use negatively impacted her job performance and behavior in the past.  (Tr. 396, 398-99).  She further stated she was connected with the Zepf Center for treatment, listing Dr. Ragothaman as her primary care physician, and self-rated her depression as mild. (Tr. 396, 398).  Notes indicated she was taking Zoloft at that time, and Plaintiff reported improvement of her depressive symptoms since starting the medication.  (Tr. 398, 400).  Further, Plaintiff reported a good relationship with her daughter, and "ok" relationships with her friend and other family members (including her sister), but then reported no relationships with any of

her siblings.  (Tr. 396).  Self-reporting indicated impulsivity related to drug use, symptoms of hyperactivity (including racing thoughts and flight of ideas), and sleep difficulties associated with anxiety.  (Tr. 400-01).  The assessment indicated Plaintiff exhibited above average intelligence and a logical thought process, but that her mental health and drug abuse negatively impacted her insight and judgment.  (Tr. 406).  Additionally, Ms. Broz observed that Plaintiff appeared agitated with rapid speech, appearing to be in the beginning stages of opiate withdrawal.  (*Id.*).

In August of 2013, Myriam Kubiak, BA, MA, an SSI Ohio Project Specialist, completed a form with Plaintiff for purposes of her social security claim.  (Tr. 270-79).  Plaintiff stated she does her own grocery shopping and prepares meals, usually gets rides from friends or relatives when she needs to get somewhere, and that she is able to use public transportation, but cannot ride her bike due to a shorter attention span.  (Tr. 272-74).  She further reported problems sleeping, stating she generally only sleeps four hours a night, and that she wakes up confused. (Tr. 271-273).  Plaintiff indicated that she has trouble concentrating and remembering things, but that she has no problems following written or verbal instructions or finishing things, and that she is able to follow the story of a one hour television program, and reads ghost stories, mysteries, and true crime stories.  (Tr. 273-74).  At this time Plaintiff stated there was no period during her disability when she did not use drugs or alcohol, but provided no answer for other questions relating to whether she used drugs or alcohol. (Tr. 274).

Ms. Kubiak additionally completed an observational statement regarding Plaintiff's functional abilities.  (Tr. 276-79).  She observed Plaintiff as having adequate persistence, cooperation, hygiene, and ability to follow simple instructions.  (Tr. 276).  However, Ms. Kubiak found Plaintiff's concentration and memory were less than adequate, noting she became easily

distracted, needed constant redirection, and had difficulty remembering past and recent events. (*Id.*).  Ms. Kubiak remarked that Plaintiff did not exhibit any other abnormal behavioral signs, and that Plaintiff did not use drugs or alcohol.  (Tr.  277).  In a letter to the Division of Disability Determination, dated August 27, 2013, Ms. Kubiak remarked that, despite being cooperative, some of Plaintiff's answers were incomplete or irrelevant, and that she attended all scheduled meetings but had difficulty staying awake and focused on task.  (Tr. 278-79).  In this letter, Ms. Kubiak summarized that her mental health and co-occurring physical health problems interfered with Plaintiff's ability to complete tasks and daily activities, and that her depressed, irritable mood and paranoia impeded her ability to relate to others, as she displayed poor social skills. (Tr. 279).

On April 6, 2014, Winkelman presented at the University of Toledo Medical Center due to opiate withdrawal.  (Tr. 597).  Plaintiff admitted to non-adherence to her mental health medication (specifically Zoloft and Trazadone), as well as to buying opiate pills off the street. (Tr. 597, 599).  On arrival Plaintiff complained of hot flashes, headaches, and tremors.  (Tr. 597). Plaintiff stated she had felt depressed for years, had worsening anxiety that kept her up all night, low energy and poor appetite, and reported suicidal ideations that "come and go."  (*Id.*).  Plaintiff further stated she had some visual hallucinations, specifically that she sees shadows.  (*Id.*). Mental status examination showed Plaintiff exhibited a guarded and indifferent attitude, sad and anxious mood, labile and restricted affect, paranoid thought content, but normal speech.  (Tr. 601). Further, Plaintiff's attention appeared intact, but showed impaired judgment and insight, as well as equivocal reliability.  (Tr. 602).  Plaintiff was diagnosed with opiate dependence and depression, NOS.  (*Id.*).

### C.  Plaintiff's Testimony

Plaintiff testified that she lost her driver's license following a DUI prior to 2012, and gets around by walking or taking the bus "when [she] can." (Tr. 43).  She reported that she took the bus to the hearing that day, and will walk to the nearest convenience store, grocery store, and church, although she later testified that she does not go to church. (Tr. 69).  Plaintiff further stated she takes a cab service provided through her medical provider to her appointments, and that she has problems taking the bus when it is crowded, because she gets irritated and has trouble being around groups of seven or more people. (Tr. 43-44).  According to her testimony, Plaintiff experiences physical symptoms when around groups of seven or more people, in the way of getting very hot, anxious, talking fast, inability to sit still, and experiencing a rapid heart rate. (Tr. 44).

Plaintiff testified she last worked in upholstery sometime around 2013, but that her "hours just sunk, big time" and that "[t]he job was making [her] sick." (Tr. 46).  At the end of her employment, she was working six to ten hours per week, and would sit at her sewing machine for five to six hours at one time, with no breaks. (Tr. 46-48).  Plaintiff testified she has not been able to work since December of 2012 due to her depression and anxiety, stating she gets sick to her stomach, nauseous, experiences headaches and has trouble focusing, and has many crying spells, two to three times per week, lasting from 20 minutes to all day. (Tr. 50, 75-76).  Plaintiff further stated she does not know what brings on her depression, that her anxiety causes her to get hostile and very judgmental, and that she has to sit for a while to collect her thoughts before making decisions or doing anything. (Tr. 50-51).  Plaintiff testified she used to read books but no longer has the attention for it, and that she watches real crime television shows, although her mind races and she sometimes turns off the television to calm down. (Tr. 52-53).  Plaintiff stated she has no trouble caring for her pet cats, including feeding them and cleaning the

17

litter box on a daily basis, and that she likes to color but has trouble finishing because she loses interest.  (Tr. 70-71).

At the hearing, the ALJ pointed to inconsistencies between the record and Plaintiff's testimony, requesting further explanation from Plaintiff's attorney.  Specifically, the ALJ asked Plaintiff's attorney to account for the discrepancy between Dr. Ragothaman's opinion at Exhibit 15F stating Plaintiff was unable to use public transportation, and her testimony that she used public transportation.  (Tr. 72-73).  Additionally, the ALJ noted Plaintiff denied drug use during her consultative examination with Dr. Robie, finding it questionable due to Dr. Robie's indication that Plaintiff exhibited cognitive delays, slurred speech, and other indicators of potential drug use.  (Tr. 73).  Plaintiff's attorney responded that she is a "poor historian," and inconsistencies were due to Plaintiff's problems with memory and an inability to focus.  (Tr. 73-74).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant engaged in substantial gainful activity since December 20, 2012, the application date.

2. The claimant has the following severe impairments of opioid dependence and major depressive disorder.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels.  The claimant is limited to understanding, remembering and carrying out simple, routine and repetitive tasks.  She may not perform fast-paced work.  Specifically, the pace of productivity should not [be] dictated by an external source over which the claimant has no control, such as an assembly line or conveyor belt.  The claimant may make judgments on simple work, and respond appropriately to usual work situations and changes in a routine work setting that is repetitive from day to day with few and expected changes.  She may not interact with the public, but may have occasional

18

interactions with co-workers and supervisors.  There should be no working in teams or in tandem.

5.  The claimant is unable to perform any past relevant work.

6.  The claimant was born on June 3, 1964 and was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.  The claimant has a limited education and is able to communicate in English.

8.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.  The claimant has not been under a disability, as defined in the Social Security Act, since December 20, 2012, the date the application was filed.

(Tr. 13-24).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

"Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed.  *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility.  *See Garner*, 745 F.2d at 387.  However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI.  ANALYSIS

### A.  The Treating Source Analysis

It is well-established that the ALJ must afford special attention to findings of a claimant's treating source.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). This doctrine, known as the "treating source rule" reflects the Social Security Administration's awareness that physicians who have a long-standing treating relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2).  The treating source rule dictates that opinions from treating physicians are given controlling weight if the opinion is both "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and "consistent with the other substantial evidence in the case record." *Wilson*, 378 F.3d at 544.

When a treating source's opinion is not entitled to controlling weight, the ALJ is required to establish the weight given to the opinion by applying factors found in the governing regulations. 20 C.F.R. §§ 416.927(c)(1)-(6), 404.1527(c)(1)-(6). These factors include: (1) the examining relationship; (2) the treatment relationship; (3) the length of treatment and frequency of examination; (4) the opinion's supportability and consistency; (5) the source's specialization; and (6) any other factors tending to support or contradict the opinion. *Id*. The regulations further require the ALJ to provide "good reasons" for the weight ultimately given to the opinion. *See Wilson*, 378 F.3d at 544 (*quoting* S.S.R. 96-2p, 1996 WL 374188 at *5). The reasons must be sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinions and the reasons for that weight. *Id.*

1. Two-Step Analysis Under *Gayheart*

Plaintiff argues that the ALJ violated the treating physician rule by not performing the distinct two-step analysis called for under *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-77 (6th Cir. 2013). In *Gayheart*, the Sixth Circuit emphasized that the regulations require two distinct analyses, with separate standards, when assessing the treating source's opinion. *Gayheart*, 710 F.3d at 375-77; *Aiello-Zak v. Comm'r of Soc. Sec.*, 47 F. Supp. 3d 550, 555 (N.D. Ohio 2014). First, the ALJ must determine whether a treating source's medical opinion is entitled to controlling weight. *Gayheart*, 710 F.3d at 376. Under this first step, the ALJ must consider whether the opinion is (1) well-supported by clinical and laboratory diagnostic techniques, and (2) consistent with other substantial evidence. *Id*. at 376.  If the ALJ determines the treating physician's opinion is not entitled to controlling weight, she must then specify the weight given that opinion, based on consideration of the factors outlined in the

regulations. *Id.* ("[T]hese factors are properly applied only after the ALJ has determined that a treating-source opinion will not be given controlling weight.").

Subsequently, this Court explained that *Gayheart* is not a new interpretation of the treating source doctrine, but instead the ruling reinforces and underscores prior Sixth Circuit holdings. *Aiello-Zak*, 47 F. Supp. 3d at 555 (*citing Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009)); *see also Wish v. Comm'r of Soc. Sec.*, No. 5:14 CV 2478, 2016 WL 1161914, *3 (N.D. Ohio Mar. 24, 2016). Under *Gayheart*, the decision must show that the ALJ considered the first step and provided good reasons for not according controlling weight to a treating source. *Id.* at 558, 558 fn. 72; *see Wish*, 2016 WL 1161914, at *4 ("Only if the ALJ decides not to give controlling weight will the analysis proceed to what weight the opinion should receive based on the [regulatory] factors."). However, courts have established that an ALJ's decision will not automatically be remanded for failure to "strictly follow the *Gayheart* template, as long as the ALJ adequately addresses the required factors and articulates good reasons for discounting the treating source's opinion. *Aiello-Zak*, 47 F. Supp. 3d at 558 (*citing Dyer v. Soc. Sec. Admin*, 568 F. App'x 422 (6th Cir. 2014)); *see also Nichols v. Colvin*, No. 1:13CV2830, 2014 WL 7410024, *12 (N.D. Ohio Dec. 31, 2014); *Brown v. Comm'r of Soc. Sec.*, No. 1:14-cv-00720, 2015 WL 4430395, *12 (N.D. Ohio July 20, 2015). Generally, *Gayheart* "only requires good reasons as to why controlling weight is not warranted," and "does not require an ALJ to give good reasons as to why each specific condition is not met." *Cox v. Comm'r of Soc. Sec.*, 5:14 CV 2233, 2015 WL 6545657, *8 (N.D. Ohio Oct. 27, 2015) (rejecting plaintiff's argument that the ALJ's treating physician analysis failed because he "telescop[ed] the two-step analysis" provided by *Gayheart*, finding it sufficient that the ALJ reasoned in the

analysis that the opinion was not consistent with other evidence).  *See also Jones v. Comm'r of Soc. Sec.*, No. 1:10 CV 2590, 2012 WL 727737, *23 (N.D. Ohio Mar. 6, 2012) ("[I]t would be a needless formality to have the ALJ repeat substantially similar factual analyses at [two] steps.") (*quoting Rice v. Barnhart*, 384 F.3d 363, 370 n. 5 (7th Cir. 2004)).

Analyzed under *Gayheart*, the court in *Aiello-Zak* upheld the ALJ's decision to give "not much weight" to a claimant's treating source, despite not specifically articulating that he was not giving the opinion "controlling weight."  *Aiello-Zak*, 47 F. Supp. 3d at 558-59.  Although recognizing the separate analysis provided by *Gayheart*, the *Aiello-Zak* court nonetheless found it sufficient that the ALJ carefully summarized the results of the claimant's objective medical records, noted the claimant's daily activities, and showed why the treating source's opinion was inconsistent with these facts. *Id.* (*citing Dyer*, 568 F. App'x at 426-27).  In so finding, the court emphasized that the Sixth Circuit court previously ruled that "the opinion of a treating source may be discounted 'where that opinion was inconsistent with other evidence of record or the assessment relied on subjective symptoms without the support of objective findings,'" essentially re-stating the prongs of step one under *Gayheart*.  *Id.* (*citing Dyer*, 568 F. App'x at 426-27).

Accordingly, Plaintiff's argument that the ALJ did not provide the proper analysis under *Gayheart* has no merit. Although the ALJ does not separately address steps one and two under *Gayheart*, her overall analysis does not fail on this point, as the decision makes clear she considered this first step in her decision to give less weight to the opinion.  In her RFC analysis, immediately following the ALJ's acknowledgment that a treating source is entitled to controlling weight where his opinion is supported by objective evidence and consistent with the record, she states that Dr. Ragothaman's opinion is afforded little weight due to its inconsistency with Plaintiff's own reports.  (Tr. 20).  Further, similar to *Aiello-Zak*, at step three the ALJ carefully

summarized Plaintiff's objective medical records and noted Plaintiff's daily activities, and then determined Dr. Ragothaman's opinion was inconsistent with the other evidence of record, thus indicating a finding of controlling weight under the requirements of step one of *Gayheart* was not required. (Tr. 15-16, 18-20). Specifically, the ALJ found Dr. Ragothaman's opinion that Plaintiff had marked restrictions in her activities of daily living, and maintaining concentration, persistence, and pace, as well as one to two episodes of decompensation, was not consistent with his own treatment findings that Plaintiff regularly exhibited logical or goal-oriented thought process with average or normal judgment and cognition.  (Tr. 16).  The ALJ also noted these limitations were not consistent with the findings of other examining clinicians and Plaintiff's own reports describing "a somewhat normal level of daily activity that demonstrates her ability to maintain attention for extended periods at least at times."  (Tr. 15-16, *citing* Tr. 241, 271-74, 347, 349, 416, 507).  Clearly indicating inconsistencies, the ALJ also supported her treating source finding by providing good reasons for giving the opinion less than controlling weight, as explained more thoroughly below.

### 2.  The ALJ's Factors Analysis and the "Good Reasons" Rule

Plaintiff next asserts that the ALJ violated the "good reasons" rule by failing to weigh each of the statutory factors or provide good reasons, supported by the evidence in the record, for giving Dr. Ragothaman's opinion less weight.  When a treating source's opinion is not entitled to controlling weight, the ALJ must determine how much weight to assign to the opinion by applying factors set forth in the governing regulations and providing "good reasons" for the weight ultimately accorded to the treating source's opinions. 20 C.F.R. §§ 416.927(c)(1)-(6), 404.1527(c)(1)-(6); *See Wilson*, 378 F.3d at 544. However, the ALJ is not required to engage in an "exhaustive factor-by-factor analysis" when determining how much weight to accord to the

24

treating source's opinion. *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804-05 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons…for the weight…give[n] [to the] treating source's opinion' …Procedurally, the regulations require no more.") (omitted text indicated in original).

Here, contrary to Plaintiff's assertion, the decision makes clear the ALJ's consideration of the regulatory factors, and provides good and valid reasons for the weight assigned.  Although she does not specifically refer to each factor individually, the ALJ's decision sufficiently demonstrates that the factors were considered, and "permits the claimant and [the] reviewing court a clear understanding of the reasons for the weight given" to Dr. Ragothaman's opinion. *Francis*, 414 F. App'x at 805.   For instance, the ALJ's reference to numerous and ongoing treatment records from July of 2013 to March of 2015 establishes the length and frequency of Dr. Ragothaman's treating relationship with Plaintiff.  (Tr. 407-09, 492-97, 499-505, 513-17, 523-29, 532-36, 545, 548, 550, 555, 557, 559-64).  She also clearly refers to Dr. Ragothaman as Plaintiff's psychiatrist and applies the treating source rule, revealing both her consideration of Dr. Ragothaman as Plaintiff's treating doctor, as well as Dr. Ragothaman's area of expertise. (Tr. 16). Further, the ALJ points to detailed inconsistencies between Dr. Ragothaman's opinion and other evidence in the record, including Plaintiff's own reports and other clinical findings, including his own treatment notes. (Tr. 16, 20).

Despite Plaintiff's argument to the contrary, the ALJ properly assessed the evidence and did not abuse her discretion in finding both internal and external inconsistencies in support of discrediting Dr. Ragothaman's opinion.  The ALJ referred specifically to Dr. Ragothaman's opinion that Plaintiff had marked restrictions in activities of daily living, marked restrictions in

maintaining concentration, persistence and pace, and suffered multiple episodes of decompensation of extended duration.  (Tr. 16, 568-72).  However, she determined his opinion was not consistent with the evidence of record, specifically:  (1) notes showing Plaintiff regularly exhibiting a logical and goal-oriented thought process, as well as normal judgment and cognition; and (2) Plaintiff's own description of her "somewhat normal level of daily activities that demonstrate her ability to maintain attention for extended periods at least at times," including taking care of her pet cat, watching one-hour television programs, and reading books.  (Tr. 16).  The ALJ further explained she afforded Dr. Ragothaman's opinion less weight because she found his opinion relating to Plaintiff's inability to use public transportation was inconsistent with Plaintiff's recurring statements throughout the record that she used public transportation, including her testimony that she rode the bus to the hearing.  (Tr. 20, 241, 273, 349).

Plaintiff argues the ALJ misinterpreted Dr. Ragothaman's opinion when she determined Plaintiff's reports of using public transportation, as well as other evidence indicating as such, were inconsistent with Dr. Ragothaman's statement that Plaintiff was "not able to use public transportation."  (Tr. 20).  In his opinion, Dr. Ragothaman stated the opinion that Plaintiff was "unable to meet competitive standards" with regard to her ability to use public transportation.  (Tr. 570).  The undersigned acknowledges that the ALJ did not quote Dr. Ragothaman's opinion word-for-word, but rather made a more generalized statement that he opined she was unable to use public transportation.  (Tr. 20).  However, Plaintiff has failed to convince this Court that the ALJ's reasoning asserts an inaccurate misstatement of Dr. Ragothaman's opinion, as his statement indicates that he believed Plaintiff was incapable of effectively utilizing public transportation during the course of a work day or work week.[5]  Plaintiff offered no authority

---

[5] "Unable to meet competitive standards" means a claimant "has noticeable difficulty (e.g., distracted from job activity) from 21 to 40 percent of the work day or workweek."  (Tr. 570).

directing that the ALJ's summarized statement of Dr. Ragothaman's opinion was inconsistent with his specific wording regarding Plaintiff's ability to use public transportation.  Further, Plaintiff fails to point to any credible evidence that would support his opinion while undermining the contradictory evidence relied on by the ALJ in finding Plaintiff was capable of using public transportation to get to work.  *See generally Simpson v. Comm'r of Soc. Sec.,* 344 Fed. App'x 181, 194 (6th Cir. 2009) ("The ALJ is not bound to accept the opinion or theory of any medical expert, but may weigh the evidence and draw his own inferences); *see generally Rudd v. Comm'r of Soc. Sec.,* 531 F. App'x 719, 728 (6th Cir. 2013) (the ALJ reserves the right to decide pertinent issues, such as the claimant's RFC, based on her evaluation of the medical and non-medical evidence); *Luukkonen v. Comm'r of Soc. Sec.*, No. 15-1561, 2016 WL 3426370, *10 (6th Cir. June 22, 2016) (*citing* 20 C.F.R. § 416.1435, "establishing claimant's burden to prove disability").

This Court does, however, find merit to Plaintiff's argument that the ALJ misinterprets Dr. Ragothaman's opinion and treatment notes relating to Plaintiff's ability to handle work stress.  The ALJ explained that his finding that Plaintiff was unable to handle stress from semi-skilled and skilled work was undermined by Plaintiff's performance of semi-skilled work during the relevant time period.  (Tr. 21).  However, the record showed Dr. Ragothaman's notes indicated Plaintiff denied any limitations with regard to such work, and later opined she was unable to handle stress related to *full time* work, with no reference to skill level.  (Tr.  408, 570).  As there is no apparent inconsistency between finding Plaintiff is not limited based on the skill level of a particular job, but is limited in her capacity to maintain full-time employment, this Court agrees this cannot be a good reason in support of the ALJ's treating source determination.

27

Despite the flaw in the ALJ's decision, remand is nonetheless not required.  A reviewing court will affirm an ALJ's decision based on mistakes where the errors are harmless.  *Keeton v. Comm'r of Soc. Sec.*, 583 Fed. App'x 515, 524 (6th Cir. 2014).  As discussed above, the ALJ provided many good reasons, including valid inconsistencies between Dr. Ragothaman's opinion and treatment records, as well as other evidence, in support of her treating source analysis.  Given all these valid reasons in support of her decision, Plaintiff has not sufficiently shown that the ALJ would likely have given more weight to Dr. Ragothaman's opinion had she not misinterpreted his findings relating to work stress limitations.  *See Keeton*, 583 Fed. App'x at 524; *see Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 158 (6th Cir. 2009) (finding no need to remand where ALJ erroneously included a misclassified job in its analysis, reasoning the error was harmless because his finding was nonetheless supported by substantial evidence).  Accordingly, this error was harmless, and remand is not appropriate.

### B.  Duty to Recontact

This Court is not persuaded by Plaintiff's argument that the ALJ had a duty to recontact Dr. Ragothaman under Soc. Sec. Ruling 96-5p, due to her finding that his opinion contained inconsistencies.  S.S.R. 96-5p, 1996 WL 374183 (July 2, 1996).  Two conditions must be met in order to trigger the duty to recontact a treating physician:  (1) "the evidence does not support a treating source's opinion," and (2) the adjudicator cannot ascertain the basis of the opinion from the record."  *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 273 (6th Cir. 2010).  Soc. Sec. Ruling 96-5p does not require an ALJ to recontact a treating doctor when the treating doctor's "opinion was deemed unpersuasive…because they were not corroborated by objective medical evidence…not because its bases were unclear."  *Ferguson*, 628 F.3d at 271-75; *see also Poe*, 342 Fed. App'x at 156 n.3. In *Ferguson*, the court found the treating source's opinion was not

28

supported by the objective medical evidence, but nonetheless rejected the plaintiff's argument that the ALJ had a duty to recontact the treating physician because the bases for her opinion—the plaintiff's reported history and subjective complaints—were clear. *Id.* at 274.

Plaintiff's contention that the ALJ had a duty to recontact Dr. Ragothaman is without merit. Review of the record does not show objective medical evidence to corroborate Dr. Ragothaman's opinion, nor does Plaintiff point to any such credible evidence in support. In fact, the ALJ found that other evidence from Plaintiff's treatment history, as well as her consultative examination with Dr. Robie, conflict with the opinion of Dr. Ragathoman. (Tr. 20-21). However, the bases for Dr. Ragothaman's opinion are ascertainable. Dr. Ragothaman generally references his treatment notes on multiple pages of the questionnaires in support of his opinion, as well as a direct reference to Plaintiff's own statements. (Tr. 408, 568-73). Review of these notes indicate Dr. Ragothaman relied on his own observations, as well as Plaintiff's self-reported history and subjective complaints in formulating his decision. (Tr. 407-09, 492-97, 499-505, 513-17, 523-29, 532-36, 545, 548, 550, 555, 557, 559-64). As the second prong of the test was not met, the ALJ had no duty to recontact Dr. Ragothaman for clarification of his opinion. *See Ferguson*, 628 F.3d at 273.

## C. **Listing Analysis**

Plaintiff's argument that the ALJ's Listing analysis at Step Three is flawed is based on her assertion that the ALJ did not properly evaluate the opinion of treating source Dr. Ragothaman. Because this Court found the ALJ's analysis of Dr. Ragothaman's opinion was valid and supported by substantial evidence, there is no need to address Plaintiff's Listing analysis argument.

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the undersigned recommends that the decision of the Commissioner be AFFIRMED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  July 5, 2016.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).